O'REILLY v. CRYER. (No. 5424.)

(Court of Civil Appeals of Texas. San Antonio. March 3, 1915. Rehearing Denied April 28, 1915.)

BROKERS ⊜61—EMPLOYMENT—COMMISSIONS —WHEN EARNED.

A broker employed to procure a purchaser who produced a purchaser ready, willing, and able to buy on obtaining good title has earned his commission, though the owner contracting to sell to the purchaser is unable to convey good title, and because of that fact the purchaser refuses to carry out the contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 77, 78, 92, 93; Dec. Dig. ⊜61.]

Appeal from Bee County Court; T. M. Cox, Judge.

Action by P. E. O'Reilly against Dan Cryer. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

B. D. Tarlton, Jr., and H. S. Boanham, both of Beeville, for appellant. Beasley & Beasley, and J. Ed Daugherty, all of Beeville, for appellee.

CARL, J. Appellant, P. E. O'Reilly, sued Dan Cryer, appellee, to recover $505.50 com-

mission for the sale of 674 acres of land belonging to appellee, at $15 per acre. Appellant urges that under his contract of employment he was to receive 5 per cent. of the sale price for effecting a sale at the stipulated price; that by effecting a sale was meant that he should produce a purchaser who was ready, willing, and able to buy; and this, he alleges, he did, but defendant refused to sell or failed to consummate the sale by reason of a defective title.

Appellee, after denying the material allegations, alleges that, since no time was mentioned in which defects of title might be cured he should have had a reasonable time for that purpose after such defects were pointed out. And he pleads that the purchaser called off the deal without giving him any opportunity to mend the defects in title to the land, and that, therefore, appellant did not effect a sale by producing a purchaser who was ready, willing, and able to buy.

The case having been tried on special issues, the questions asked and answers thereto by the jury are as follows:

"(1) Was it proven by the preponderance of the testimony that defendant, Dan Cryer, entered into an agreement with H. Borchers, as a part of which said agreement the said Cryer agreed to furnish to the said Borchers an abstract showing clear title in him to the lands? Answer: Yes.

"(2) Whether or not you find that it was proven by the preponderance of the testimony that the defendant, Dan Cryer, entered into an agreement with H. Borchers obligating himself to furnish to said Borchers an abstract showing clear title in said Cryer to the land, then, under all the circumstances of the case, did said Cryer have a reasonable time or opportunity before the negotiations were broken off by the said Borchers within which to furnish such an abstract to the said Borchers? Answer: No.

"(3) Was it a part of O'Reilly's contract of employment with Cryer to sell Cryer's land that O'Reilly was not to receive his commission of 5 per cent. until a sale had been finally consummated? Answer: It was not a part of the contract.

"(4) Was Cryer willing to have the abstract completed and to perfect and cure such objections and defects therein as had been pointed out to him by Borchers' attorney? Answer: Yes.

"(5) Did Borchers or his agent and attorney, Boales, break off the negotiations for the sale of the land without demanding or requesting of Cryer that he cure or perfect the objections or defects in the title to said land pointed out by Boales, and without giving Cryer an opportunity to meet such objections? Answer: Yes."

Upon the answers so returned, the court entered judgment for defendant, Cryer, and O'Reilly has appealed.

The undisputed evidence shows that Borchers agreed to buy the land, and went to Beeville with his money ready to close the deal, and that he would have closed the deal if the title had been good. And the overwhelming testimony shows that one of the main considerations was that the purchaser was to have immediate possession of the farm. Borchers said:

"I agreed to buy the crops on the place separate from the land. Cryer said he would turn the place over to me if I bought the crops. I bought the crops to get immediate possession of it. Cryer did not make any proposition to me to clear up the title that I remember. I did not make a proposition to him to clear up the title. It was the understanding between Cryer and myself that if I took the crops I took the place at once. * * * Cryer did not at that time, nor as far as I can remember, intimate to me that he would clear up the title or make the abstract good. All I wanted, and all I requested in my negotiations with Mr. Cryer, was that he furnish me a good title to the land. Mr. Cryer did not at that time, nor as far as I can remember, intimate to me that he would clear up the title or make the abstract good."

This is also indicated by Cryer's own statement:

"Now, if you want this place, I tell you what I'll do: If you will give me $1,000 for my crops, I will turn the place over to you as soon as we make the deed.' And he said he didn't have any teams, and I said: 'I will sell you a team and put them in.' So I sold him two mare mules and two horse mules for $350, and then he wanted some corn, and I told him that he could have what I had for 50 cents per bushel; and then he said that he didn't have any plows, and I told him that I would give him plows enough; that I would throw them in; and finally he said: 'All right; when can you get your deed up or furnish me an abstract?' I said: 'Yes; I can furnish you an abstract, but it isn't here; it is in San Antonio. * * * Now, I will write to Hill to send that abstract to Beeville. About when can you be there?' He said: 'I will be in Beeville Monday.' I said: 'All right.' That was on Thursday morning, and he said he would be here Monday—I think it was Thursday; I am not certain—and I wrote to Hill to send the abstract here to the Commercial Bank, and when I got here Monday the abstract was not here. We waited until Monday evening. Mr. Borchers was here, and he asked me if I had gotten my abstract, and I said: 'No; it hasn't come, but it ought to be here to-day.' And I waited until evening and called for my mail, and it didn't come; so I went to the phone office and phoned Hill to send that abstract down, and he said: 'I will send it down to-morrow.' That would be Tuesday; so late Tuesday evening it came in with the mail, and Mr. Borchers phoned Mr. Boales to come down at the same time when I phoned for my abstract; so Boales came down Tuesday evening on the train, and I turned that abstract over to him Tuesday night, and he examined that abstract Tuesday night and all day Wednesday."

Mr. Cryer further testified:

"I told him that the abstract had not been brought down to date at that time. I didn't tell him of any other defects. * * * When Borchers called for that abstract I knew that he meant for that abstract to show that I had title. * * * He didn't want to buy the crops; didn't want to pay the $1,000. But he finally agreed to pay that if I would give him immediate possession of the place. * * * That was about the 20th of March, I reckon. He didn't object very strenuously to buying the crop in order to get immediate possession of it; he did offer to pay me that $1,000."

So it will be seen that both Borchers and Cryer understood that immediate possession was to be given, and Cryer fixed the time in which to get his abstract down from San Antonio. Borchers went home and got his money and returned to Beeville Monday, the day Cryer had set, and then, when the abstract did not arrive Monday, Borchers remained until Tuesday, when it did arrive.

Then he set his attorney to work so they could close the deal, and Thursday report was made that the title was bad. They then differed as to how much it would take to perfect the title, and thereupon Cryer went and employed an attorney. The abstract of title was introduced in evidence, and it did not show a good title. Also the opinion of an attorney for a loan company, in which many specific defects were pointed out, is in evidence, and the record shows that it took from March 20th until in November to get the title in such shape that this loan company would make the loan, and it cost Cryer a good sum of money to have those defects cured. Among other things, Cox, the attorney employed, had to get some quitclaim deeds from the Thomas Redmon heirs, and he obtained affidavits to show the heirship of Cryer, for the record title did not stand in his name, and also affidavits to show limitation title. He got a certified copy of the A. J. Davis patent and a quitclaim deed from the tax collector. There were two or three outstanding evidences of title cleared up, and one or two that could not be cleared up. He got a quitclaim deed from Wilson and Marsden, attorneys in fact for B. M. Odem. An affidavit was obtained to show that M. J. Cryer was a widow, and the title from her to D. C. Cryer and W. R. Cryer was shown by an affidavit as to their heirship to her, and by showing that she died without a will. Some releases were obtained from various and distant parts of the state. Cox says that he used diligence, but the delay was caused in getting papers executed and returned. These quitclaim deeds, affidavits, etc., were not shown in the abstract submitted to Borchers, but were in the supplement. There was also an old suit pending against the Redmon heirs. This is enough to show that the defects in the title were not merely fanciful, insubstantial, and meaningless matters without merit, but were such as any prudent lawyer would see and ask to be corrected in passing upon the title.

Borchers did not agree to wait a reasonable time to pach up defects, but then and there agreed to buy and pay cash, if Cryer furnished him a clear title. This Cryer agreed to do, and failed in the time he had himself fixed for so doing. Knowing, as he did, that Borchers wanted immediate possession—so much so, indeed, that he bought the crop, teams, and tools—Cryer was not in a position to claim time in which to make an attempt to perfect a title which it took him about six months to accomplish.

The jury found that Cryer was to give Borchers a clear title, and that O'Reilly's commission did not depend on the final consummation of the sale. His duty was to produce a purchaser ready, willing, and able to buy, and this he did. He had done all he could do, and that the title was not good was no fault of his. Cryer fixed the time himself in which to get ready to close, and was not able to meet it. But, even if he had been entitled to a reasonable time in which to cure the defects, which we do not concede under the facts in this case, he could not have done so, under all the facts and circumstances of this case.

Under the findings Nos. 1 and 3 of the jury and the facts proven, O'Reilly was clearly entitled to his commission, and the judgment of the trial court is reversed, and judgment is here rendered that appellant, P. E. O'Reilly, do have and recover of and from appellee, Dan Cryer, the sum of $505.50, and interest thereon from March 20, 1913, at 6 per cent. per annum, and all costs of the court below and of this court, for all of which he may have execution.

Reversed and rendered.

---

⬀For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes